UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

UNITED STATES OF AMERICA                    CRIMINAL ACTION

VERSUS                                       NUMBER: 09-00355

THOMAS JUDSON POOLE, IV                      SECTION: "L"(5)


**REPORT AND RECOMMENDATION**


Pursuant to 18 U.S.C. §3664(d)(6) and an order of reference from the District Judge, the undersigned makes the following recommendation as to the amount of restitution that is due in this matter. (Rec. docs. 74-93).

On August 20, 2010, Thomas Judson Poole, IV, defendant herein, was charged in a one-count superseding bill of information with voluntary manslaughter within the special maritime jurisdiction of the United States in violation of 18 U.S.C. §§7(1) and (7) and 1112(a). (Rec. doc. 63). Pursuant to a plea agreement with the government, on August 23, 2010, defendant pled guilty to the charge set forth in the superseding bill of information. (Rec. docs. 67,

64).[1]/ On January 20, 2011, defendant was sentenced to seventy-eight months in the custody of the U.S. Bureau of Prisons to be followed by three years of supervised release. (Rec. docs. 72, 73). The amount of restitution owed by the defendant could not be agreed to and was thus referred to the undersigned for a preliminary determination. (Rec. doc. 74). Following the filing of briefs by the parties an evidentiary hearing was held over the course of two separate days. (Rec. docs. 81-84, 87).[2]/ Post-hearing briefs have since been filed by the government and the defendant. (Rec. docs.

---

[1]/ The plea agreement provides, <u>inter alia</u>, as follows:

> ... the Government and the defendant agree that the defendant will make restitution for all losses relating to the offense of conviction and all losses covered by the same course of conduct or common scheme or plan as the offense of conviction. The exact restitution figure will be calculated and recommended by the United States Probation Services and, ultimately, determined and ordered by the Court. It is also understood that the restitution provisions of Sections 3663 and 3663A of Title 18, United States Code will apply and the defendant agrees that any restitution imposed will be non-dischargeable in any bankruptcy proceeding and that the defendant will not seek or cause to be sought a discharge or a finding of dischargeability as to the restitution obligation.

> (Rec. doc. 67, p. 2).

[2]/ Largely due to the logistical problems associated with transporting the defendant to and his being incarcerated out-of-state, the parties expressly waived the ninety-day determination period prescribed by 18 U.S.C. §3664(d)(5). (Rec. doc. 84, pp. 81-82). A belated restitution order is thus permissible. <u>See</u> <u>United States v. Stout</u>, 597 F.Supp.2d 963, 973 (S.D. Iowa 2009).

92, 93).

As gleaned from the record and the parties' submissions, in late September of 2009, the M/V MISS SHARLOTT, a fishing vessel captained by Michael Holman and owned by his father, Deral Holman, left the docks of Bon Secour, Alabama, for a commercial fishing voyage in the Gulf of Mexico. (Rec. doc. 68, pp. 1-2). In addition to the captain, two crewman, the defendant and Guadalupe Gomez, were aboard the vessel. (Id. at p. 2). Early on in the voyage, Poole became ill and suffered a seizure and/or was rendered unconscious for a period of several hours. (Tr. of Aug. 2, 2011 at pp. 21-22; PSR at p. 5, ¶ 11). Over the next few days, Poole's condition worsened, he began requesting that the vessel return to port so he could obtain medical attention, and tensions rose between the captain and Poole over his inability to work. (PSR at p. 5, ¶ 11). Several days into the trip, while the vessel was moored to an unmanned oil platform for fishing purposes, Poole climbed onto the platform with the hope of summoning someone who could bring him back to shore, even bringing a flare gun from the vessel with him that ended up being unloaded. (Id. at ¶ 12). After several hours, Gomez advised Poole that the captain was willing to return to shore and Poole was persuaded to return to the vessel only to learn that they would not be returning to port for two more days. (Id.).

Thereafter, during the early morning hours of October 7, 2009, a heated verbal altercation began between Poole and the captain. During the course of that altercation, Poole grabbed a nearby fishing knife and stabbed and/or cut the captain over thirty times, inflicting multiple wounds to his face, legs, hands, back, and chest, ultimately resulting in his death. (Rec. doc. 68, p. 2, PSR at p. 6, ¶ 13, 15). As the attack was in progress, the captain implored Gomez to help him disarm Poole who threatened Gomez and cut his fingers as well. (Rec. doc. 93-1, p. 1). The captain managed to pick up a hammer and strike Poole in the head but the captain eventually succumbed to his wounds. (Id. at p. 2; PSR at p. 6, ¶ 13). Poole also sustained significant lacerations to his hands during the physical altercation. (PSR at p. 13, ¶ 57; tr. of Aug. 2, 2011 at pp. 4-5). Poole admitted to stabbing the captain numerous times, even after he had quit fighting. (Rec. doc. 68, p. 3; PSR at p. 6, ¶ 13).

After the altercation had concluded, the MISS SHARLOTT was piloted to a manned oil platform an unknown distance away. (Rec. doc. 68, p. 3). As will be discussed more fully infra, the evidence of record provides several versions as to precisely how that occurred. Suffice it to say that at some point the MISS SHARLOTT came into contact with the rig causing significant damage to the vessel. (Rec. doc. 81-3, pp. 2-7). The government now seeks

an order of restitution in favor of the decedent's father, Deral Holman, for losses falling into the following three categories: 1) expenses related to the funeral of the decedent; 2) damage to the M/V MISS SHARLOTT; and, 3) recovery for the decedent's lost future wages.

Under the Mandatory Victims Restitution Act of 1996 ("MVRA"), 18 U.S.C. §3663A, a court is required to order a defendant to pay restitution following, <u>inter alia</u>, a conviction for a crime of violence. 18 U.S.C. §3663A(c)(1)(A). Voluntary manslaughter is a crime of violence for purposes of the MVRA. <u>United States v. Serawop</u>, 505 F.3d 1112, 1119 (10th Cir. 2007). In such instances, the order of restitution should require that a defendant "... pay an amount equal to the cost of necessary funeral and related services." 18 U.S.C. §3663A(b)(3); <u>Serawop</u>, 505 F.3d at 1119-20. In the present case, the defendant concedes that the funeral expenses of $1,518.00 that were expended by the decedent's father are well-documented and are properly subject to an order of restitution. (Rec. docs. 82, pp. 1-2; 92, p. 1). Accordingly, it will be recommended that the decedent's father be awarded restitution in the amount of $1,518.00 to cover the decedent's funeral expenses.

The second category of restitution sought by the government is for the damage that was caused to the M/V MISS SHARLOTT. Under the

MVRA, a court is to order a defendant to make restitution to the victim of an offense or, if the victim is deceased, to the victim's estate. 18 U.S.C. §3663A(a)(1). As used in the MVRA, "... the term 'victim' means a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered ..." 18 U.S.C. §3663A(a)(2). Construing nearly identical statutory language that appears in the Crime Victims' Rights Act ("CVRA"), 18 U.S.C. §3771(d)(3), the Fifth Circuit has noted that the phrase "directly and proximately harmed" imposes dual requirements of cause-in-fact- and forseeability. In re Fisher, 640 F.3d 645, 648 (5th Cir. 2011). "A person is directly harmed by the commission of a federal offense where that offense is a but-for cause of the harm." Id. (footnote omitted). "A person is proximately harmed when the harm is a reasonably foreseeable consequence of the criminal conduct." Id. (footnote omitted). "'Under the plain language of the statute, a party may qualify as a victim, even though it may not have been the target of the crime, as long as it suffers harm as a result of the crime's commission.'" Id. (quoting In re Stewart, 552 F.3d 1285, 1289 (11th Cir. 2008)). "A defendant sentenced under the MVRA is only responsible to pay restitution for the conduct underlying the offense for which he has been convicted." United States v. Adams, 363 F.3d 363, 366 (5th Cir. 2004).

6

The government bears the burden of proving both the entitlement to and the amount of restitution by a preponderance of the evidence. <u>United States v. Donaby</u>, 349 F.3d 1046, 1053-54 (7th Cir. 2003); <u>United States v. Reese</u>, 998 F.2d 1275, 1282 (5th Cir. 1993). The government must show not only that a particular loss would not have occurred but for the conduct underlying the offense of conviction, but also that the causel nexus between the conduct and the loss is not too attenuated, either factually or temporally. <u>United States v. Vaknin</u>, 112 F.3d 579, 590 (1st Cir. 1997), <u>abrogated</u> <u>on</u> <u>other</u> <u>grounds</u> <u>by</u> <u>United States v. Booker</u>, 543 U.S. 220, 125 S.Ct. 738 (2005). "A sentencing court should undertake an individualized inquiry; what constitutes sufficient causation can only be determined case by case, in a fact-specific probe." <u>Id</u>. Thus, to be "directly and proximately harmed" by the commission of the manslaughter in this case, the loss to the decedent's father must have been caused by the specific conduct that is the basis of the conviction. <u>Donaby</u>, 349 F.3d at 1052-53.

As noted earlier, the evidence of record provides varying versions as to how the MISS SHARLOTT came to be piloted to the manned oil platform and what occurred after it arrived there. Before the grand jury, Gomez provided the following testimony:

> Q. What happened after Mickey [the victim] went to the I think you said the back of the boat?

A.   Mickey went towards the back of the boat where I used to do the fishing.  He went to the area where I used to fish from.  He sat down and then he laid down and then he died.

Q.   What did Thomas [Poole] do at that point?

A.   After Mickey laid down and didn't move anymore, I grabbed the when (sic) of the boat and started steering the boat.  And I said to Thomas, if you want, call the Coast Guard.  Maybe they can help us.  And he said no, go towards the platform.  And I said no, I am not going to the platform.  If you want to do that, do it yourself.  And I'm sorry, he said if you don't do that, I will kill you.  And that's when he took the boast (sic) against the platform.  And at that point I jumped off the boat and went up to the platform.

                                        (Rec. doc. 93-1, p. 2).

    The Factual Basis that was agreed to by the parties on August

17, 2010 provides as follows:

        [t]he government would introduce, through the testimony of multiple witnesses, that, after Holman passed away, **POOLE** spent the next hour guiding the Miss Sharlott to an oil platform.  Once the Miss Sharlott arrived at the platform, the authorities, including the United States Coast Guard and the Federal Bureau of Investigation were notified and began an investigation.

                                        (Rec. doc. 68, p. 3).

    For its part, the PSR contains the following version of the

events that occurred after the captain's death:

        [a]fter the fight, the defendant ordered the witness [i.e., Gomez] to drive the boat to a lighted oil platform nearby.  The witness complied; however, the boat had mechanical problems and crashed into the dock of the oil

8

> rig. Once they were able to secure the boat
> to the dock, the defendant ordered the witness
> to climb onto the rig and get help. A short
> time later, the witness and several workers
> from the oil rig returned to provide first aid
> to the defendant. The United States Coast
> Guard was subsequently contacted for
> assistance.

(PSR at p. 6, ¶ 14).

At the second day of the evidentiary hearing that was held in this matter, the defendant testified that, due to the injuries he had sustained in the physical altercation with the captain, he was unable to steer the MISS SHARLOTT. As a result, Gomez piloted the vessel after Poole "... told him to go to the first named platform ..." (Tr. of Aug. 2, 2011 at p. 5). Once they arrived there, Poole testified that Gomez gave him a boost up to the platform which was approximately ten feet above the waterline. (<u>Id</u>. at pp. 6-7). Gomez then followed Poole up onto the platform as well. (<u>Id</u>. at p. 7). When asked whether he was able to tie up the boat before climbing up onto the platform, Poole answered in the negative but added that "Lupe was able to tie off the boat." (<u>Id</u>. at p. 8). However, Poole immediately contradicted himself, testifying that Gomez "... didn't tie off the boat as far as I know." (<u>Id</u>. at p. 9). In subsequent testimony, Poole reiterated that he preceded Gomez in getting off the boat and onto the rig, leaving Gomez in a position to tie off the vessel. (<u>Id</u>. at p. 10).

Defense counsel then sought to delve into the contents of a statement that had been given to the FBI by an employee who was on the rig when the MISS SHARLOTT arrived there but the Court directed him to focus on matters within Poole's own personal knowledge. (Id. at pp. 10-11). Poole explained that once he was on the platform, he activated an emergency shutdown button in an attempt to obtain medical assistance from personnel on the rig. (Id. at pp. 11-12). Poole testified that once he was on the platform, he never saw the boat, any rig workers tie off the vessel, or the vessel coming unattached from the rig and its roof collapsing, causing the throttle to stick and making the vessel circle around in the water. (Id. at pp. 12-14). Poole characterized the electronic equipment onboard the MISS SHARLOTT as old and outdated. (Id. at pp. 15-17).

On cross-examination, Poole testified that he had never owned or captained a commercial fishing vessel before and his role on the voyage was simply to fish for approximately $1,000 in pay. (Id. at pp. 17-23). Following a side-bar conference, the Court took judicial notice of the fact that Poole had stabbed the captain to death. (Id. at pp. 25-27). Poole was initially uncertain as to what Gomez may have said as the physical altercation with the captain was in progress and further testified that Gomez had actually assisted the captain in trying to subdue him. (Id. at p. 28). Defendant denied "ordering" Gomez to pilot the boat to the

platform but admitting "telling" or "asking" him to do so, ultimately acknowledging that Gomez had asked him not to hurt him after the captain had died. (Id. at pp. 29-30). Poole specifically denied knowing that the vessel had crashed against the pilings of the rig, testifying that when he left the MISS SHARLOTT it was "perfectly intact". (Id. at pp. 31-32).

Following defendant's testimony, the government initially considered calling its case agent to the stand but then decided that that was unnecessary. (Id. at pp. 33-34). At the defense's suggestion, the parties stipulated that four rig workers who had given statements to the FBI would, if called to the stand, testify consistent to what was in those statements. (Id. at pp. 35-37). The written statements of the witnesses (so-called "302's") were admitted as exhibits. (Rec. docs. 87-1 to 87-4). The first of those statements had been given by Benton Bernard, a pain medic who was on another platform that was located nearby. After receiving a call that a medic was needed, Bernard was transported to the rig MP311A via helicopter where he first encountered Gomez who showed him where Poole was situated on a lower level. Bernard saw Poole's various injuries and also observed the MISS SHARLOTT tied to the platform with the captain's body on the back deck of the boat. According to the statement, "[t]he boat was rocking up and down and BERNARD decided not to go on the boat." (Rec. doc. 87-1 at pp. 1-

2).

The second statement had been given by Gary Michael Castleberry, the lead operator in charge of the platform. On October 7, 2009 at approximately 5:45 a.m., Castleberry heard the emergency shutdown alarm activate and proceeded to the bottom of the platform accompanied by another worker, Daniel Conan, for further investigation. Castleberry was first approached by Gomez who told im that his "friend was injured". (Rec. doc. 87-2, p. 1). Castleberry then walked to the lowest deck of the platform where he observed Poole "... and a boat docked to the rig." (Id.). Castleberry then spoke to an area foreman in Lafayette who instructed him to get information on the boat, whereupon Castleberry "... walked back down to the deck and saw a body on the boat. The body was located on the deck, under the cover of the boat and a lot of blood was visible on the work table." (Id.).

The third statement admitted as an exhibit had been given by James Brice Herndon, an operator on the rig. Herndon stated that after hearing the emergency shutdown alarm he went to investigate accompanied by Castleberry and another rig worker. Upon encountering Poole, Herndon stayed with him while Castleberry and the other worker went to get a medic. Poole advised Herndon that he had been involved in a knife fight and that the other person was on the boat and was deceased. "HERNDON looked at the boat and

could see the boat still running and not tied to the platform.
HERNDON and a co-worker later tied the boat to the platform and saw
a body on the boat." (Rec. doc. 87-3, p. 1). "HERNDON stated that
at some point the boat became unattached to the platform and the
roof collapsed causing the throttle to stick.  The boat circled
around the Gulf of Mexico for about an hour until the Coast Guard
arrived and secured it." (<u>Id</u>. at p. 2).

The fourth statement that was taken by the FBI was from Joshua
Witt, a maintenance worker on the platform.  He also heard the
shutdown alarm and in the course of investigating saw the medical
cabinet open and heard two other workers, including Herndon,
talking about someone getting cut.  "WITT then saw CRAIG, another
platform worker, down on the lowest level of the platform with an
unknown white male.  WITT also saw a boat next to the platform.
WITT went to the lowest level of the platform and helped to tie the
boat to the platform." (Rec. doc. 87-4, p. 1).  Witt estimated that
he spent approximately thirty minutes with Poole. (<u>Id</u>.).  "WITT
said he could see what appeared to be the body of a male from the
waist up on the boat attached to the platform." (<u>Id</u>. at p. 2).

In <u>United States v. Speakman</u>, 594 F.3d 1165, 1172 (10th Cir.
2010), the Tenth Circuit held "... that, for the purposes of
determining if an individual is a 'victim' under the MVRA, an
individual will be 'proximately harmed as a result of' the

defendant's crime if either there are no intervening causes, or, if there are any such causes, if those causes are directly related to the defendant's offense."  See also United States v. Meksian, 170 F.3d 1260, 1263 (9th Cir. 1999).

Based upon the evidence that is presently before the Court, it appears that the MISS SHARLOTT, whether piloted by Poole or by Gomez at Poole's discretion, made it to the manned platform unscathed.  Once there, Poole exited the vessel and went onto the rig followed by Gomez.  While it does not appear that either of them secured the MISS SHARLOTT to the platform prior to disembarking it also does not appear that the vessel had sustained any damage up to this point in time.  In responding to the shutdown alarm, Herndon and/or Witt subsequently arrived on the scene, observed the boat still running, and proceeded to secure the boat to the platform.  By the time that Castleberry got there, the vessel had already been tied to the rig.  After being transported to the platform via helicopter, Bernard, the medic, similarly observed the MISS SHARLOTT tied to the rig although it was rocking up and down.  Witt estimated that he spent some thirty minutes attending to Poole and it appears that the vessel continued to be secured to the platform throughout this time.  Thereafter, according to Herndon, "... at some point ..." the boat became unattached from the platform and sustained damage, causing the

throttle to stick and the boat to circle around in the Gulf for approximately an hour before the Coast Guard arrived and secured it. Simply put, the damage to the MISS SHARLOTT appears to have occurred some time after Poole had left the vessel and after the rig workers had successfully secured it to the platform. Whether the damage to the vessel ultimately occurred as a result of a faulty tie-off, high seas, or some combination thereof, those forces operated as intervening causes that were not directly related to the original act of manslaughter. Accordingly, it will be recommended that no restitution for the damage to the MISS SHARLOTT be ordered.

In the alternative, even assuming that Poole was responsible for the damage to the MISS SHARLOTT, the valuation of the vessel has not been sufficiently established here. The Court has before it no appraisal of the damaged vessel, no insurance policy valuing the vessel before the incident, and no income tax returns listing the vessel as a business asset and depreciating it. In addition, the MISS SHARLOTT has not been repaired and no one who testified as to the cost of replacing given items actually saw the damaged vessel and confirmed that those items were on board in September of 2009. The government's first witness testified that the estimate he had prepared was based upon his review of four photographs of the vessel. He had not been asked to inspect the boat or to prepare

a detailed estimate.  He was also unaware of the age of the boat or its purchase price. (Rec. doc. 84, pp. 11-26).  The government's second witness had never performed any work on the MISS SHARLOTT in the past and had prepared his damage estimate based solely upon photos of the boat and without the benefit of an inventory of the equipment that was on board. (<u>Id</u>. at pp. 27-38).  The government's third witness to testify had also never received information on the purchase price of the vessel or a pre-incident appraisal, was unaware of the age of the equipment on the boat and its original versus replacement value, and had no personal knowledge of precisely what equipment was on the boat. (<u>Id</u>. at pp. 39-45). Moreover, no evidence was presented to the Court establishing the reasonable useful life of the vessel as is done in typical maritime property damage cases.  While testimony was presented by the victim's father as to the purchase price of the vessel, the Court has no credible evidence before it to determine what it was worth when it was damaged and would simply be speculating on that point. Even assuming that Poole is responsible for the damage to the MISS SHARLOTT, the amount of restitution in that regard has not been proven by a preponderance of the evidence. <u>Donaby</u>, 349 F.3d at 1053-54.

The third category of restitution sought by the government is for the decedent's lost future income.  While such an award is

clearly not precluded by the MVRA, any award of lost future income must not be based upon speculation or conduct unrelated to the offense of conviction as such an award would be inconsistent with congressional intent. <u>United States v. Cienfuegos</u>, 462 F.3d 1160, 1164-69 (10th Cir. 2006). "Speculative losses are incompatible with the MVRA'S statutory scheme because '[o]ne cannot bear the burden of proving the amount of a loss by a preponderance of the evidence when it is no more than possible that the loss will occur at all.'" <u>Id</u>. at 1168-69 (quoting <u>United States v. Follet</u>, 269 F.3d 996, 1002 (9th Cir. 2001)).

As of the date that the PSR was prepared in this matter, the Probation Office was still awaiting a response from the decedent's family regarding losses that were incurred due to the defendant's criminal act. (PSR at p. 6, ¶ 16, 17; p. 17, ¶ 85). At the first day of the evidentiary hearing, the probation officer acknowledged having received an estimate from the government as to the decedent's lost wages over a ten year period. (Rec. doc. 84, p. 44). The officer had also received from the defense documentation of the decedent's criminal history during that same ten-year period. (<u>Id</u>. at pp. 44-45). Although the probation officer had not determined precisely how much time the decedent had served in the past ten years, he did acknowledge a federal conviction with an attendant five-year sentence and convictions in Florida resulting

in jail time, a parole release, and a subsequent violation of that parole. (Id.).

Following the probation officer, the decedent's father took the stand. He testified that his son was a commercial fisherman/seamen who had worked for him as well others over the years. On some fishing trips he had paid the decedent between $2,000 and $3,000; on other occasions, the pay would be $800 to $900 depending on the weather and other factors. On average, the pay was $2,000 per trip with the trips usually lasting two to three days. In the absence of storm activity in the Gulf, Mr. Holman estimated that the decedent made an average of three trips with him per month and that his son received greater compensation for this work activity than he did from other employers. (Id. at pp. 58-62).

Despite an exhaustive search, neither Mr. Holman nor the decedent's girlfriend had been able to locate the decedent's tax returns. What Mr. Holman had been able to provide the government was documentation showing that the decedent had been paid the following amounts on the four noted days: $1,031 on July 21, 2008; $3,586 on June 2, 2008; $981.90 on July 3, 2008; and, $647.25 on August 13, 2008 (½ of $1,294.50). Mr. Holman admitted to having some type of log books documenting the catches realized on fishing trips going back to 1993 but they are not part of the record. (Id. at pp. 63-67; rec. doc. 81-8, pp. 2-6).

Upon being tendered to the defense for cross-examination, Mr. Holman testified that he had no knowledge of whether his son had actually filed tax returns in the past. The only documents that Mr. Holman had been able to locate reflecting wages paid to the decedent were the four discussed above which covered a roughly nine-week period in the summer of 2008. Mr. Holman acknowledged that there were periods of time in the past ten years when the decedent had not worked (e.g., when he was incarcerated). Within the past several years the decedent had spent some of his time living with Mr. Holman in Florida and some of his time in Louisiana with his girlfriend. Mr. Holman was uncertain how many times in the first nine months of 2009 the decedent had worked for him nor could he give any estimate for work activity in 2007 or 2006 although the decedent was always working. (<u>Id</u>. at pp. 69-74).

The government seeks restitution for the decedent's lost wages in the amount of $200,000.00. That figure was arrived at by taking, from the four pay-related documents that were attached to the government's pre-hearing memo, a conservative average of $1,000 that the decedent had been paid during a nine-week period in 2008; multiplying that figure by twenty, a conservative number of fishing trips the decedent would have presumably made per year; and, then multiplying that figure by ten, the number of years that the decedent might have been expected to work given his age of fifty-

three at the time of his death.

Based upon the evidence that has been presented to the Court, any award of lost future income would be largely speculative. The Court has not been presented with any tax returns documenting the decedent's actual earnings nor any expert economic testimony. Mr. Holman was unaware of how much his son had earned in the first nine months of 2009 or in 2007 or 2006. The only corroboration of the decedent's earnings over the past ten years came in the form of four pay-related documents covering a nine-week period in 2008 in which he earned approximately $6,2000.00. While the Court is not unsympathetic to Mr. Holman's loss, any award for lost future income would be predicated upon speculation. Moreover, in the typical maritime personal injury case, a decedent's parents suing for wrongful death may only recover pecuniary damages. See, e.g., In re: American River Transportation Co., 490 F.3d 351, 355-56 (5th Cir. 2007). In the matter at hand, the Court received no testimony from Mr. Holman that he received any monies from his son or was dependent on him in any way, nor was there testimony that the decedent had other dependents who could make such a claim. Accordingly, it will be recommended that restitution for the loss of the decedent's future income be disallowed.

## RECOMMENDATION

For the foregoing reasons, it is recommended that the decedent's father, Deral Holman, be awarded restitution in the

amount of $1,518.00 for the decedent's funeral-related expenses.

IT IS FURTHER recommended that restitution for the damage to the M/V MISS SHARLOTT and the decedent's lost future income be disallowed.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation contained in a magistrate judge's report and recommendation within fourteen days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. <u>Douglass v. United Services Auto. Assoc.</u>, 79 F.3d 1415 (5th Cir. 1996)(<u>en banc</u>).

New Orleans, Louisiana, this <u>11th</u> day of <u>July</u>, 2012.

_Alma L. Chasez_
ALMA L. CHASEZ
UNITED STATES MAGISTRATE JUDGE
